IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 27, 2019

## TROY LOVE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
No. 112312PC       Steven Wayne Sword, Judge

————————————————————

## No. E2019-00111-CCA-R3-PC

————————————————————

The petitioner, Troy Love, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Troy Love.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme Allen, District Attorney General; and Sarah Keith, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

A Knox County jury convicted the petitioner of two counts of rape of a child and one count of aggravated sexual battery, and the petitioner appealed. Tenn. Code Ann. §§ 39-13-504; -522. On appeal, this Court affirmed the petitioner's convictions for rape of a child but reversed the aggravated sexual battery conviction due to error in the trial court's instructions to the jury. In reaching this conclusion, we summarized the facts of the petitioner's crimes, as follows:[1]

---

[1] The proof presented at trial and this Court's summary of the same was extensive. Thus, we have only included the portions of our prior summary which are relevant to the issue on appeal.

The [petitioner's] convictions relate to sexual abuse of his step-great-granddaughter. At the trial, the victim, who was nine years old at the time of the trial, testified that she knew the difference between a good touch, such as a hug, and a bad touch, which she described as "someone's touching you in a part you don't like." She said bad touches had occurred when the [petitioner] touched her "private parts" and her "butt" with his fingers and his mouth. Using a diagram of a female and a male child, she identified the areas corresponding to the "private" and "butt." She said the touching began when she was six years old and continued until she was eight. She said it occurred in the [petitioner's] living room and bedroom.

Relative to an incident in the [petitioner's] bedroom, the victim testified that as she watched television, the [petitioner] came into the room, went under the sheets, and touched her "private" with his mouth. She said the [petitioner's] actions made her sad.

Relative to an incident in the [petitioner's] living room, the victim testified that as she napped on the couch, the [petitioner] came to the couch where she was sitting, that she moved to the end of the couch, and that the [petitioner] touched her private with his finger and his mouth. She thought she was in second grade when this incident occurred.

Relative to an incident in the movie room at her old house, the victim testified that she sat on the couch, wore "footsies," and watched a movie. She said the [petitioner] unzipped her clothing and touched her private with his finger. She said his finger did not go inside her.

When asked whether the [petitioner] touched her privates on any other occasions, the victim said he did not. She said the [petitioner] never put anything, including his finger or his private, in her private. She likewise stated that she could not recall any other incidents in which he touched her body with other parts of his body.

The victim testified that the [petitioner's] wife had passed away, that she had spent a lot of time with the [petitioner] and his wife, and that she visited frequently at their house. She said she called the [petitioner] "Troy."

The victim testified that when she was in second grade, her mother and her grandmother took her to a place with a Wii gaming system and that she talked to a woman and made drawings with her. She said she told the

truth to the woman and did not tell her anything that was not true. She said her mother and grandmother were not in the room when the woman talked to her. She recalled the woman's stating that video cameras were recording what happened. She agreed she told the woman that her "grandpa" had touched her in places she did not like. She agreed she told the woman the incidents began after the Friday on which the victim had her tonsils removed. She agreed that the incident she described in the [petitioner's] bedroom occurred on the Sunday after her tonsils were removed and that she had told the woman who interviewed her that she had asked to go to the [petitioner's] house that day. She agreed she had told the woman that she went home on Monday and told her mother on Tuesday about the touching. She agreed that the woman drew a timeline based on the interview, and the timeline was received as an exhibit.

The victim testified that she did not remember the woman asking her if the [petitioner] ever put his private in her private. After reviewing a portion of the video recording outside the presence of the jury, the victim testified that watching a video recording had helped her remember what she said. She said she told the woman the [petitioner] had put his private in her private. She did not recall if the woman asked how the victim's body felt when the [petitioner] did this, but she later said she remembered telling the woman her body felt tingly after the [petitioner] put his private in her private. She remembered telling the woman that the [petitioner] lay on top of her when he put his private in her private. She recalled telling the woman that the [petitioner] did not have to do anything to his private part before putting it inside her and that it was inside her, not just close to her private part. She remembered telling the woman that she was five years old the first time the [petitioner] put his private part in her private part. She recalled telling the woman that the [petitioner] put his private part in hers seven or eight times and that she never saw the [petitioner's] private part. The victim recalled telling the woman that she did not remember how the [petitioner's] private part felt.

The victim identified a drawing she made for the woman who interviewed her, and it was received as an exhibit. She recalled telling the woman that the drawing showed "where the pee comes out of." She recalled telling the woman that when she went to the bathroom "that night," she saw something that looked like "boogers" in the part of her underwear that "went under her private."

- 3 -

The victim acknowledged that she had testified that the [petitioner] did not put his finger in her private. She remembered telling the woman who interviewed her that the [petitioner] had put his finger in her private, and she recalled showing the woman what the [petitioner] did with his finger but did not recall what she had done.

The victim testified that she had her tonsils removed when she was seven and one-half years old and that she told her mother about the abuse after she had her tonsils removed. She said she told "Jessica" about the abuse before she told her mother. She did not recall what she told the woman who interviewed her when the woman asked why the victim told Jessica about the abuse.

The victim acknowledged her previous testimony that she did not remember what she told the woman who interviewed her about what the [petitioner] did with his finger inside the victim and said that watching the video recording had not helped her remember. A portion of the recording was played for the jury, and the court noted that it pertained to "this question that [the prosecutor] just asked [the victim]." The court instructed the jury that its consideration of the recording was limited to matters concerning the victim's credibility and was not to be considered as substantive evidence.

The victim testified that after viewing the recording, she recalled why she decided to tell Jessica about the abuse. The victim said she told the woman who interviewed her that she told Jessica because it was something important. The victim acknowledged that in the recording, she told the woman that she and Jessica had talked about their favorite people and that the victim had said her "uncle" was her favorite person because he had touched her "in the bad spots." The victim testified that no one other than the [petitioner] had touched her in "private spots."

. . .

The January 14, 2013 recording of the calls [between the victim's mother and the petitioner] was played for the jury and reflects the following: A call was placed, and a message was received stating that the caller was not authorized to call the number. In the second call, the victim's mother identified herself to the [petitioner] and asked why he "did this" to the victim. The [petitioner's] response is unintelligible. The victim's mother stated she wanted to know what he did to the victim, and

the [petitioner] responded that he could not talk about it now. The victim's mother stated that he had no choice. The victim's mother stated that the [petitioner] hung up. In a third call, the victim's mother told the [petitioner] that he owed it to the victim's mother and the victim to tell the victim's mother why he had done "this." She stated that the [petitioner] hung up again. In a fourth call, the victim's mother told the [petitioner] to quit hanging up and stated he had to talk to her about "this." She stated he owed it to her and her daughter, who had loved and trusted him. The [petitioner] stated, "I know, honey. I didn't mean to do it." He said, "I gave in, and I shouldn't have." The [petitioner] stated that he was depressed, that he did not know why he did it, that it was horrible, and that he wished he were dead. The victim's mother stated that the victim said the [petitioner] "put something in her" and asked what he put in the victim. The [petitioner] repeated, "that I put something in her." The victim's mother asked what he did and then stated that the [petitioner] hung up. Fifth and sixth calls were placed, and a voicemail message began playing in both. Following discussion about making a call from a different telephone number, a seventh call was placed, which reached a voicemail recording. Between the calls, the victim's mother talked to Detective Spangler and Travis Bishop, an employee of the Department of Children's Services, about how the victim's mother should proceed in speaking to the [petitioner].

. . .

A voicemail message that the [petitioner] left for Detective Spangler on January 22, 2013[,] was played. In it, the [petitioner] stated that he was calling Detective Spangler in response to her questions about allegations of sexual abuse of the victim. He stated that he was impotent and unable to have sex and that he had been unable to have sex with his wife before her death. He stated that he had "issues" with the victim and that she had a history of lying. He stated that the victim had told him she had sex with two boys but that she would not tell him the boys' names. He stated that the victim had "issues" with "sexual things" and "honesty and telling the truth." He said the victim told him that she had seen her father and stepmother engaged in sexual activity. He said the victim had stolen $120 from his wallet, which was inside a drawer.

. . .

- 5 -

Relative to the victim's forensic interview at Child Help, Detective Spangler testified that in a forensic interview, a child was alone with a trained interviewer who was not biased and did not ask leading questions. She said she and Mr. Bishop watched the interview. She agreed that the victim first made allegations against the [petitioner] on January 8, 2013, and that the forensic interview occurred on January 13. She agreed that after watching the forensic interview, she and Mr. Bishop talked to the victim's mother and the victim's grandmother to see if the victim's account could be corroborated and noted that children are not good with "their times, their timeline."

. . .

A voicemail message that the [petitioner] left for the victim's grandmother on January 8, 2013[,] was played. In it, the [petitioner] stated that he wanted to talk to her about what she called about earlier that day. The [petitioner] stated that he had not wanted to talk around others earlier and that he did not have sex with the victim "or anything like that." He stated that the victim "makes up stories" and that she had told him she had had boyfriends and had sex but that he had not believed her. He said he had asked the victim to identify her boyfriends but that she did not. He said he thought the victim exaggerated things. He said he and the victim wrestled but did not do anything sexual.

The victim's grandmother testified that she called the [petitioner] after she received the preceding voicemail message and asked what was going on and why the victim made the allegations. She said he stated that he did not know, that he had been depressed, that he was sorry, and that if the victim's family did not notify the police, he would leave town and they would never see him again. She said the [petitioner] stated that he could not go to jail and would rather die. She said the [petitioner] put his house on the market and left town within three weeks to one month. She agreed that she told Detective Spangler she had the ability to see the [petitioner's] cell phone records because she paid for his service and thought she told Detective Spangler that she had not seen any calls from the [petitioner] to his relatives in Michigan between January 8 and January 14, 2013. After reviewing a recording outside the presence of the jury, the victim's grandmother agreed that at Detective Spangler's direction on January 14, she attempted to make a one-party-consent call to the [petitioner] after the calls placed by the victim's mother.

. . .

The victim's mother testified as a defense witness that the victim never told her "completely" about the allegations. The victim's mother said the victim had not had any contact with the [petitioner] since making the allegations.

The victim's mother testified that the victim's tonsils were removed on January 4, 2013. The victim's mother said that following the surgery, the victim stayed primarily with the victim's mother and "Jessica." She said the victim did not stay with the [petitioner] after the victim's tonsils were removed. The victim's mother said the victim never stated that anyone other than the [petitioner] touched the victim.

The victim's mother testified that she did not know of a time when the victim suddenly had $120 in cash. When asked if she would know if the victim had $120, the victim's mother said she would not.

The [petitioner] testified that he did not commit the acts to which the victim testified. He denied putting anything inside the victim. He denied touching her inappropriately. The [petitioner] stated that he, his wife, and his two stepdaughters moved from Michigan to Tennessee in 1980. He said that he lived in Knoxville for thirty-three years, until 2013, during which time he worked as a housepainter. He said that, aside from the present charges, he had never been arrested, convicted of a crime, or accused of anything similar.

The [petitioner] testified that his wife died on June 5, 2012, from hip surgery complications. He said that they had been married for thirty-three years, that her death was unexpected, that he was depressed afterward, and that it took him a long time to get over her death. He said he had financial difficulty after her death, that he had to sell his car, and that he was facing foreclosure of his home mortgage. He said he had been unable to find work in Knoxville.

The [petitioner] testified that he had been impotent since shortly before his wife's death. He said he did not seek medical treatment because he had been busy taking care of her and trying to make a living. He said he did not seek treatment after her death because he was depressed and "wasn't worried about that kind of thing." He said he was not thinking about having sex with anyone at that time.

The [petitioner] testified that the victim grew up with him as her great-grandfather, that they were close, and that he had taken her and her brother fishing. He said she last stayed overnight at his house in December 2012. He said that it was not unusual for the victim to spend the night at his house and that the victim and her brother stayed there. Relative to the victim's last overnight visit, he said that he slept in his bed upstairs and that she slept downstairs on the couch. He said that the victim never came into his bedroom that night, that they would have watched television or movies in the living room, and that he never "went downstairs to the couch" that night. He denied putting his mouth on her vagina that night. He said that the next day, he took her to visit her cousins and then took her to her grandmother's house. He said he "took her up to the house" and would not have left her if no one had been home, but he did not recall who had been home.

The [petitioner] recalled that he received a telephone call from the victim's grandmother on January 8, 2013, regarding allegations the victim made against him. He said he had been at work and unable to talk about personal matters and that he returned her call later. He said he denied the allegations in a voice message he left for the victim's grandmother "[b]ecause it didn't happen." He did not recall having a January 14 conversation with the victim's grandmother in which he said he would rather die than go to jail. He said that he received six or seven "harassing-type" calls on January 14, in which the unidentified callers wanted him to admit wrongdoing. He said he was angry and kept hanging up. The [petitioner] denied that he called the victim's mother and "basically admitted" the victim's allegations and that he said he would "disappear." He denied saying he would rather be dead than incarcerated and said the victim and the victim's mother lied in their testimony when they said otherwise.

The [petitioner] addressed the January 14, 2013 telephone call, a recording of which was played during the State's case-in-chief. Regarding his statements in the call that he did not mean to do it, that he gave in, and that he should not have given in, he said he meant it as an apology for not having told the victim's mother about the victim's having said to him that she had sex with two boyfriends. He said the victim also stated she had seen her mother and stepfather having sex. He said that he had not told the victim's mother because he had not believed the victim and stated that the victim was "having issues" and had stolen $120 from his wallet. He said he

regretted not telling the victim's mother about what the victim had said because if he had told her, she "maybe . . . wouldn't have been telling lies about" him. When asked if his statements were in reference to having touched the victim or put his mouth on her vagina, he responded, "Of course not." He said he had stated he wished he were dead because everything in his life was going wrong. He noted his wife's death, his financial problems, his unemployment, the victim's accusations, and his family's disowning him. He said he felt like his "life was a hell." He said he had not wished he was dead because he had put his mouth on the victim's vagina or touched her inappropriately. The [petitioner] acknowledged, however, that his response about not having meant to do it, having given in, and that he should not have given in had been in response to the victim's mother's question asking why he had "done this" to the victim. He acknowledged his apology had been vague. He also acknowledged that he knew the victim had made sexual allegations against him when he said it. He did not recall stating in the telephone calls that he was weak but agreed that if the recording reflected he had said it, he did.

The [petitioner] testified that he did not have anywhere to stay in Knoxville in February 2013 and that none of his family in Knoxville was speaking to him. He said he went to Michigan to be with family, have a place to stay, and look for work. He said that in Michigan, he was able to stay with his brother and that he found work. He said he leased his Knoxville house to someone who was eventually able to obtain a mortgage and purchase it.

The [petitioner] agreed that he had raised the victim's grandmother, who was his stepdaughter, and that they were close and trusted each other at the time the victim made the allegations.

After receiving the proof, the jury found the [petitioner] guilty of rape of a child for the vaginal/oral penetration occurring at the [petitioner's] house on his bed, guilty of rape of a child for the vaginal/oral penetration occurring on the couch in the [petitioner's] living room, and guilty of aggravated sexual battery for the vaginal/digital contact related to an act in the movie room of the victim's old house. After the [petitioner] was sentenced to serve an effective fifty years, this appeal followed.

*State v. Troy Love*, No. E2015-02297-CCA-R3-CD, 2017 WL 1077062, at *1-7 (Tenn. Crim. App. Mar. 21, 2017), *perm. app. denied* (Tenn. July 20, 2017).

The petitioner subsequently filed a pro se petition for post-conviction relief alleging the ineffective assistance of both trial and appellate counsel. The post-conviction court appointed counsel, and the petitioner filed an amended petition wherein he argued trial counsel was ineffective for using the victim's "inculpatory" forensic interview to impeach her during cross-examination "after she denied during her trial testimony that the [p]etitioner had sexual intercourse with her or penetrated her with his finger." In support of his argument, the petitioner relied on the transcripts from his trial and the argument of counsel. The post-conviction court denied relief, noting "the use of the statement for impeachment purposes was not deficient performance." This timely appeal followed.

*Analysis*

On appeal, the petitioner asserts trial counsel was ineffective for utilizing the victim's forensic interview during cross-examination. According to the petitioner, the interview exposed additional allegations of sexual abuse that the victim did not testify to during trial. The State contends trial counsel made a strategic decision to use the interview to impeach the victim by identifying the inconsistencies between the victim's trial testimony and the statements she made during the interview. The State also argues the petitioner cannot show prejudice regarding trial counsel's use of the interview as the trial court instructed the jury the interview could only be considered for impeachment purposes. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110 (f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the

standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Further, when reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.*

Here, the petitioner argues trial counsel was ineffective for impeaching the victim with statements she made during a forensic interview because the interview included

additional allegations of sexual abuse not disclosed during the victim's direct examination. The post-conviction court provided the following assessment of trial counsel's strategy regarding the victim's conflicting statements:

> . . . [Trial counsel] was not deficient in the performance of her duties by using the prior statement to impeach the victim. The defense theory of the case was that the victim was having personal problems and was lying about the abuse by the [p]etitioner. His argument to the jury was that none of the things the victim was saying happened, not just what she said during the forensic interview, but also what she said during the trial.

> An important part of the attack on the victim's credibility was that she was unable to keep her story straight. When impeaching a witness with a prior inconsistent statement, it isn't important what was said in the two different statements. It is the difference in allegations that is important. In this case, [trial counsel] was attempting to show the jury that the victim was making significantly different accusations against the [p]etitioner than what she had originally claimed. Playing the portions of the interview that were inconsistent with her trial testimony allowed [trial counsel] to effectively argue that there was reasonable doubt regarding the testimony the victim made during the trial. The court finds this decision to be a sound strategic decision and not deficient performance.

Our review of the record mirrors that of the post-conviction court. At trial, the victim testified to three instances of sexual abuse wherein the petitioner touched her vagina with his mouth, finger, or both. The victim denied any other instances of sexual abuse and stated the petitioner did not insert his finger or penis in her vagina. However, in the forensic interview, the victim claimed the petitioner had sex with her multiple times and inserted his finger into her vagina. During cross-examination, trial counsel used the forensic interview to impeach the victim with her inconsistent statements despite the fact that some of the statements were damaging to the petitioner. Trial counsel's strategy is clear in the record, and the petitioner does not dispute the same, noting in his brief that "the overall defense strategy was to attack [the victim's] credibility as a witness." Accordingly, the record demonstrates trial counsel utilized the forensic interview for impeachment purposes in order to identify multiple inconsistencies in the victim's allegations against the petitioner in support of the defense theory that all of the victim's allegations were false. Nothing in the record indicates this strategy was not sound, and the petitioner failed to present additional evidence in support of his claim. *See Strickland*, 466 U.S. 689. Simply because trial counsel's strategy was unsuccessful does not render her assistance ineffective. *Cooper*, 847 S.W.2d at 528. As such, the petitioner has failed to show how trial counsel's use of the forensic interview constituted

ineffective assistance of counsel. *See Strickland*, 466 U.S. at 694. This argument is without merit.

Additionally, we note, the petitioner cannot establish prejudice because of the limiting and curative measures taken by the trial court. The record indicates trial counsel used the interview to demonstrate inconsistencies in the victim's testimony and prior statements, including statements about whether the petitioner ever "put his private part in [her] private part," why the victim told her aunt about the abuse, and what the petitioner did with his finger when it was inside her vagina. Therefore, before allowing the jury to hear the applicable portions of the interview, the trial court instructed the jury that the evidence was only to be used for assessing the victim's credibility. *Troy Love*, 2017 WL 1077062, at *2. This Court presumes the jury followed the trial court's instructions. *State v. Joshua R. Starner*, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at *21 (Tenn. Crim. App. Apr. 20, 2016) (citing *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006); *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001)). The petitioner is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE

- 13 -